ROBERT GOODLET, JR., AND CHARLES BERNARD SHAW, PLAINTIFFS-APPELLANTS, v. GEORGE F. GOODMAN, WARDEN, NEW JERSEY STATE PRISON, DEFENDANT-RESPONDENT.

Argued February 6 and 7, 1961—Decided March 21, 1961.

*Mr. Samuel A. Donio* argued the cause for plaintiff-appellant Charles Bernard Shaw.

*Mr. Samuel Epstein* argued the cause for plaintiff-appellant Robert Goodlet, Jr.

*Mr. Augustine A. Repetto,* Atlantic County Prosecutor, argued the cause for defendant-respondent (*Mr. Louis M. Mallin,* Assistant County Prosecutor, of counsel).

The opinion of the court was delivered by

FRANCIS, J.  The problem presented here is the legality of the dismissal of plaintiffs' writ of *habeas corpus* by the Atlantic County Court.  Review was sought in the Appellate Division of the Superior Court but we certified the appeal before argument there.  One of the criminal convictions involved having been for murder, we consider that appeal directly to this court would have been the proper course.  See *R. R.* 1:2–1(*c*).

On December 10, 1946 plaintiffs Goodlet and Shaw and three other persons pleaded *non vult* in the Atlantic County Court of Oyer and Terminer to an indictment charging them with murder.  On December 19, 1946 all five also pleaded guilty to three additional indictments for robbery and one for breaking and entering and larceny.  All offenses were committed between November 12 and 17, 1946.  Goodlet and Shaw were sentenced on December 19, 1946 to State Prison for life on the murder charge and to a total term

of 48 to 52 years for the other offenses. Some uncertainty seems to have existed as to whether the sentences were to be concurrent or consecutive. The trial court, however, in this proceeding declared them to be concurrent and on the record before us that is clearly the proper determination. At the time of imposition of the sentences, Goodlet was 17 years, 4 months and 26 days old; Shaw's age was 17 years, 11 months and 18 days.

Almost 13 years later, on September 2, 1959, plaintiffs filed the application which resulted in issuance of and hearing on the writ now before us. According to the prison records they now have a parole eligibility date of August 6, 1961.

The attack on the imprisonment is predicated upon the grounds (1) that the arrests for the crimes charged having occurred in North Carolina and plaintiffs having been removed to New Jersey by police officers of this State without extradition proceedings, the prosecution here violated due process of law; (2) that both Goodlet and Shaw were juveniles at the time of the crimes and sentences, and that, as to the murder charge the order transferring the complaint from the Juvenile and Domestic Relations Court to the Court of Oyer and Terminer was invalid because it was entered *ex parte* and without hearing, and as to the robbery and breaking and entering and larceny complaints no order of transfer having been obtained by the State, the Court of Oyer and Terminer had no authority to accept their pleas of guilty and to impose sentence thereon; and (3) the pleas of *non vult* and guilty were made without adequate assistance of counsel and under such fundamentally unfair circumstances as to require a judgment that the convictions and sentences constituted a denial of due process.

According to the indictments Goodlet, Shaw and others on November 12, 1946 broke and entered certain premises and stole property therefrom; on November 13 they committed three armed robberies, and on November 17 while in the course of another armed holdup both Goodlet and

Shaw shot one of the victims, as the result of which he died. They then fled to North Carolina where they were apprehended by local police, Goodlet on November 25, and Shaw on November 26, 1946. A third confederate, one Thompson, was also arrested in the same State. New Jersey police officers appeared in North Carolina with warrants for the arrest of the three men. The local authorities of the latter State turned the prisoners over on November 26 to the New Jersey officers who immediately transported them by automobile to Atlantic County. No extradition proceedings were engaged in.

At the hearing on this writ of habeas corpus (which consumed 6 days) the Prosecutor produced proof that all three accused, after being informed about extradition proceedings, voluntarily agreed to return to New Jersey and in fact freely discussed the various crimes on the way back. Also, a report of a psychological examination of Goodlet on March 26, 1947 in the Mental Hygiene Bureau of the State Prison mentions among other things that he "came back [to New Jersey] without extradition under his mother's advice."

██ It is not necessary to decide whether plaintiffs waived extradition or were brought back in violation of the statutory requirement to pursue such proceedings before removing an accused from a foreign jurisdiction. The rule is firmly established that the power of a state to prosecute and convict a person for crime is not impaired by the fact that he comes within the court's jurisdiction involuntarily. Due process is satisfied if he is brought before the court to answer charges of which he is fully aware and if he is convicted fairly in accordance with constitutional procedural safeguards. *Frisbie v. Collins,* 342 *U. S.* 519, 72 *S. Ct.* 509, 96 *L. Ed.* 541 (1952); *State v. La Salle,* 19 *N. J. Super.* 510, 515 (*App. Div.* 1952).

The officers and their prisoners reached Atlantic County late at night on November 27 or early morning of November 28. Goodlet and Shaw were lodged in the County Jail with-

out any formal questioning or efforts by the authorities to obtain written statements from them. The following day they were taken to the State Police Barracks at Hammonton in the same county where they were told they were going to be asked some questions concerning the fatal holdup. They were advised also that any answers "may and can be used" against them, that they were not being threatened or promised anything, and that any answers must be of their own free will. Then they were asked if, under the circumstances, they were willing to give a statement. They agreed to do so and within two or three hours a typewritten confession was taken in question and answer form from each of them. Goodlet's statement shows "November 29, 1946, 1:30 p. m."; Shaw's bears the same date but the time stated is 3:00 p. m.

The testimony of the Captain of Detectives who participated in the questioning is to the effect that the confessions were voluntarily given, without any physical or mental abuse or coercion or promises of reward. Others of the officers who were present at the time have since died or retired and were not available as witnesses. In any event, in this proceeding neither Goodlet nor Shaw made any attack on the confessions nor did they deny or offer to deny any of the inculpatory facts appearing therein. In fact, Goodlet testified that whatever answers he gave during the interview were truthful. And Shaw conceded that prior to sentence he told his original attorney he was guilty of the murder. Each statement recites that it was read before signing, that there was no desire to add anything more to it, and that it was true in its entirety. The signatures were written immediately below the assertion of truth. Further, in post-conviction interviews with psychologists at State Prison for classification purposes both Goodlet and Shaw readily admitted their participation in the holdup and fatal shooting for which the life sentence was imposed.

When the homicide confessions were completed, plaintiffs were taken before the municipal magistrate in

whose court the murder complaints had been filed. There the complaints were read to them and, according to Detective Captain Juliano, they pleaded guilty. (Since that time the magistrate has died and his records could not be located.) They were not represented by counsel at the time. The plea played no part in the ultimate disposition of the case; nor could it have had any influence in that connection. Under *R. S.* 2:138-3 (now *N. J. S.* 2A:113-3), such a plea to an indictment for murder was barred. The statute is regarded as establishing the public policy of the State so strongly that the accused cannot waive it. If at the trial of an indictment for murder evidence of a plea of guilty to the original complaint before a magistrate is received even without objection, prejudicial error is committed. *State v. Leaks,* 124 *N. J. L.* 261 (*E. & A.* 1940). Moreover, in this case at the time Goodlet and Shaw were juveniles and at that stage of the proceedings exclusive jurisdiction being in the Juvenile and Domestic Relations Court of Atlantic County, any arraignment in the Magistrate's Court was improper. *L.* 1946, *c.* 77, *p.* 267; *R. S.* 9:18-12.

Since Goodlet and Shaw were not yet 18 years old, they were still juvenile offenders within *R. S.* 9:18-12 (now *N. J. S. A.* 2A:4-14, 15). That act conferred on the Juvenile and Domestic Relations Court exclusive jurisdiction to hear and determine all cases of juvenile delinquency (which, for purposes of the statute, included murder and the other offenses involved in this case) subject to the following exception:

"If it shall appear to the satisfaction of the court that the case of any person between the ages of sixteen and eighteen years should not be dealt with by the court, either because of the fact that the person is an habitual offender, or has been charged with an offense of a heinous nature, under circumstances which may require the imposition of a sentence rather than the disposition permitted by this chapter for the welfare of society, then the court may refer such case to the prosecutor of the pleas of the county wherein the court is situate.

Such cases will thereafter be dealt with in exactly the same manner as any other criminal case involving an adult offender."

This section became effective on April 12, 1946, roughly seven months before plaintiffs were arrested. Prior thereto, the ordinary jurisdiction of the Juvenile and Domestic Relations Court related to children under the age of 16, subject to a somewhat different provision as to the 16–18 year age group. As to such latter persons, exclusive jurisdiction over them with respect to offenses such as concern us here was acquired only if the complaint was certified by the grand jury with the approval of the prosecutor or by the prosecutor or a judge of the Court of Quarter Sessions or Special Sessions, for disposition by the judge of the Juvenile and Domestic Relations Court. *L.* 1943, *c.* 97. No particular procedure was prescribed to consummate such a certification. The matter seemed to be administrative in character and apparently was handled in *ex parte* fashion. When the 1946 amendment was enacted, decision as to whether a juvenile between 16 and 18 years of age should be tried as an adult was placed in the hands of the Juvenile and Domestic Relations Court, subject to the conditions stated. No hearing on the question was expressly provided for and testimony on the present writ reveals that the practice commonly followed by the Prosecutor was to apply *ex parte* and informally for an order to transfer the prosecution to the particular county criminal tribunal which would have jurisdiction if the offense had been committed by a person over 18 years of age.

In 1946 the same judges sat in both Juvenile and Domestic Relations and Oyer and Terminer Courts in Atlantic County. So a judge who signed an order of transfer from the former tribunal might very well sit on the trial of the case in the latter.

The then Prosecutor, as well as the Assistant Prosecutor who was in active charge of the criminal proceedings, realized that of the five persons accused of all of the offenses, Goodlet and Shaw were juveniles. On several occasions the Prosecutor discussed the murder and the robberies and the matter of transfer with one of the two judges who sat in both

Juvenile and Domestic Relations and the county criminal courts. The Assistant Prosecutor, who actually obtained the order, testified also that the judge was aware of all the charges involved. In support of the Prosecutor's testimony it may be noted that although plaintiffs' written confessions were given on November 29, 1946, the order of reference was not signed until December 5. The order recited that:

"It appearing to the satisfaction of the Court that the crime of Murder so charged against each of the minors aforesaid is an offense of a heinous nature which, in the judgment of the Court, requires the imposition of a sentence in the event of guilt of the accused, rather than the disposition permitted under Chapter 77 of the Pamphlet Laws of New Jersey, 1946;

It is therefore, on this 5th day of December, one thousand nine hundred and forty-six, Ordered that the complaints, warrants and all other papers and matters now or hereafter concerning each of the minors aforesaid, respecting the Charge of Murder so pending against each of them, be and the same are hereby referred to the Prosecutor of the Pleas of the County of Atlantic for disposition in the same manner as in other criminal cases involving an adult offender, pursuant to the Statute in such case made and provided."

The order was obtained *ex parte,* and without formal hearing of any kind. It seems clear from the record that Goodlet and Shaw had counsel (more as to this later) at the time and that he was aware of the reference prior to the entry of the *non vult* and guilty pleas. No order of reference was sought or given for the robbery or breaking and entering and larceny charges. The Assistant Prosecutor explained this omission on the ground that he believed such action would have been superfluous. It was his view that when the court with full knowledge of all the accusations concluded that plaintiffs should be prosecuted as adults because of the heinous crime of murder, the State was justified in seeking indictments covering the entire wave of criminal acts. Pursuant to that opinion indictments were obtained as to all offenses on December 6, 1946, the day after the order of reference.

Goodlet and Shaw contend that their pleas of *non vult* and conviction of murder should be vacated because they

had no hearing in the Juvenile and Domestic Relations Court before the order of reference to the adult county criminal court was entered. For this they rely upon *State v. Van Buren,* 29 *N. J.* 548 (1959). As to the robbery and breaking and entering and larceny indictments, they say no order of reference out of the Juvenile and Domestic Relations Court having been made, the Court of Oyer and Terminer never acquired jurisdiction over them, and therefore the pleas of guilty and resulting convictions cannot stand.

Between 1946 and 1959 there was no decision in this State to the effect that a juvenile of 16 to 18 years of age was entitled to a hearing on the question whether a complaint against him for a serious infraction of the criminal law should be referred to the adult tribunal for disposition. It was routine for the Prosecutor to apply *ex parte* and undertake to satisfy the Juvenile Court that the dereliction charged was heinous or that the youth was an habitual offender, and that the case was one which, under the statute, ought to be dealt with as if a person over 18 years were the accused. When the issue was raised for the first time in *State v. Van Buren, supra,* the decision announced represented an effort on the part of the court to reflect the spirit of the present day in the legislative prescription for juvenile offenders. Although the act (now *N. J. S.* 2A:4–15) makes no express provision for hearing on the preliminary problem of retaining jurisdiction or reference to the Prosecutor for adult treatment, fairness to the parties involved in the light of the legislative objective was deemed to impose such a requirement. Certain aspects of the opinion must be reemphasized however. The rule, manifestly intended to be prospective in operation, does not call for or permit a decision as to guilt or innocence or juvenile delinquency. The hearing contemplated is to provide the juvenile with "an opportunity to be heard with respect to the facts which the court has received from the sources available to it and upon which it is inclined to relinquish jurisdiction," under the criteria for decision set

forth in the statute. *State v. Van Buren, supra,* 29 *N. J.,* at *pp.* 556–557. Murder, it was said, is *per se* a heinous offense and the court in its discretion would be justified in concluding that no more is needed to warrant relinquishment of the case. In the present situation the judge who occupied both the juvenile and the adult criminal benches, after several conferences with the Prosecutor with respect to the series of derelictions charged to these plaintiffs and others, concluded that the murder alleged was a heinous offense and referred the matter for grand jury consideration. Once the indictment was returned obviously the Court of Oyer and Terminer had jurisdiction to entertain it. The judge who signed the order of reference also sat in the latter court when the *non vult* pleas were entered and he later imposed the life sentence. At the time of the plea, Goodlet and Shaw were represented by an experienced attorney. Prior to sentence a second attorney of wide experience in the criminal law was appointed by the court to aid him and the accused. Both attorneys must have known of their clients' ages and of the relinquishment of jurisdiction by the Juvenile and Domestic Relations Court. At no time did they attack the order of reference or ask for a hearing thereon. They accepted the jurisdiction of Oyer and Terminer without protest and acknowledged their clients' guilt of murder before that tribunal. In the present proceeding there is no suggestion that the young men were not guilty of the murder and we can discover no basis for a finding that they suffered any prejudice as the result of the lack of a hearing of the type envisaged by *Van Buren* before assignment of the complaint for adult treatment.

The further attack on the robbery and breaking and entering and larceny convictions arises out of the failure to obtain an order referring the complaints to the Prosecutor for disposition. It is asserted that as a consequence the Court of Oyer and Terminer never acquired jurisdiction over plaintiffs. The State concedes absence of such a formal order. It contends, however, that at best the deficiency

represents a mere irregularity which brought no prejudice to plaintiffs under the circumstances of the case. As has been set forth above, all of these offenses which ended in the murder were committed over a period of a few days. The Prosecutor discussed the entire criminal episode with the Juvenile Court Judge when seeking the reference for grand jury action. Apparently it was the Prosecutor's intention to handle all charges in Oyer and Terminer, depending upon the attitude revealed by the judge in the conferences on transfer. In that connection it is significant that no indictments were obtained from the Grand Jury on any of the complaints until the order of transfer was made. Plainly the Prosecutor's belief was that the court's conclusion that Goodlet and Shaw should be treated as adult offenders and sentenced as such accomplished a relinquishment of their persons for all purposes associated with the crimes allegedly committed. It would indeed be incongruous under the total crime picture presented here to send the robbery-murder case to the adult tribunal for sentence upon conviction, and to retain the other robberies and breaking and entering for juvenile treatment. And of course, after conviction for murder and sentence to life imprisonment as an adult offender, it is inconceivable that the Juvenile Court could retain jurisdiction, find Goodlet and Shaw guilty of delinquency as to the other offenses and subject them to the rehabilitative treatment designed for juvenile offenders. Awareness of these factors undoubtedly is the reason why the Assistant Prosecutor, who prepared the order yielding the jurisdiction on the murder charge, regarded specific reference to the other offenses as unnecessary. Moreover, it may be noted that the order executed on December 5, 1946 somewhat ambiguously referred the "complaints, warrants *and all other papers and matters now or hereafter concerning each of the minors aforesaid,* respecting the charge of Murder against each of them * * *" to the Prosecutor "for disposition in the same manner as in other criminal cases involving an adult

offender * * *." The record on this writ of *habeas corpus* reveals that the sentence on the murder charge was imposed by the judge who signed the order, while the sentences on the other offenses were meted out by another judge of the same court. The latter judge had no independent recollection as to whether he knew at the time that Goodlet and Shaw were under 18 years of age. He testified, however, that such knowledge would have made no difference in the imprisonment he visited upon them. He said:

"In this case we had a series of crimes, I believe one breaking and entering and three armed robberies, and subsequently this alleged murder.

This fact transcends what is ordinarily considered a juvenile offense or anything that I would ordinarily have considered a juvenile offense. * * *"

In any event experienced counsel, fully aware of the juvenility of their clients, accepted the jurisdiction of Oyer and Terminer, entered guilty pleas there, discussed the matter of sentences at a conference or conferences with the Prosecutor and the court (according to the best recollection of the court), and submitted the youths for sentence, all without protest of any kind.

The absence of specific order of reference on these offenses, of course, was an irregularity. In view of the procedure now required by the *Van Buren* opinion, it is not likely to occur again. But in any event consideration of all of the facts spread before us on this phase of the matter persuades us that no harmful error was committed which would warrant the invalidation of the sentences.

Finally, we come to the contention that all of the convictions should be set aside because the *non vult* and guilty pleas were made without adequate assistance of counsel and under such fundamentally unfair conditions as to constitute a denial of due process. In essence, the claim is that Goodlet and Shaw were without counsel until December 10, 1946, the day they appeared in court to enter their *non vult* plea

to the murder indictment. They assert that the nature of the offense, the possible consequences as to them, and the effect of the *non vult* plea were not adequately discussed with them so as to make them fully understand the course upon which they were about to embark. They further claim that between December 10 and December 19, the date of sentence on the murder plea and of plea and sentence on the other indictments, although they then had two assigned attorneys, no adequate understanding of their situation and the effect of their pleas was conveyed to them. And they assert that since there were five defendants involved in the various pleas, more than two attorneys should have been assigned to represent them.

Most of the testimony at the hearing centered about the claim of inadequate representation by counsel. This does not mean incompetency; such criticism is expressly disclaimed. The nub of the argument is that the representation was too late and too little. More specifically, the alleged lack of counsel until the very day on which the murder plea was entered, which allowed only a relatively few minutes for conference with the five defendants, is said to have rendered meaningless the mandate for appointment of counsel for indigent defendants. See *R. S.* 2:190–3*; *Powell v. State of Alabama,* 287 *U. S.* 45, 53 *S. Ct.* 55, 77 *L. Ed.* 158 (1932); *Application of Palumbo,* 58 *N. J. Super.* 80 (*App. Div.* 1959). This phase of the case represents the heart of the demand for vacation of the convictions.

██ If it be true that Goodlet and Shaw were not given counsel in time for him to discuss fully, and in such fashion that they understood, the charges against them, the issue of their guilt or innocence, the possible consequences of a trial, the nature of the pleas that were open to them as well as the possible sentences, and to provide a reasonable period thereafter for deliberation on the course they wished to follow, relief from their present predicament must be

---

* Now *N. J. S.* 2A:163–1.

granted. The burden of establishing those facts by a fair preponderance of the evidence, however, rests upon them. *State v. Cynkowski*, 10 *N. J.* 571 (1952). At the conclusion of the hearing the trial court declared them to be unworthy of belief and decided on the basis of all the testimony and exhibits that their proof burden had not been sustained. We find ample basis in the record in support of that view.

The testimony reveals that shortly after the arrest of Goodlet and Shaw, and before any of the indictments were returned, they were represented by Isaac C. Nutter, of Atlantic City, who died a few years ago. According to Lewis P. Scott, the then Prosecutor, the parents of "one or two" of the accused had contacted Mr. Nutter through a Philadelphia attorney. Both of the accused lived in Philadelphia when the offenses were committed. Robert N. McAllister, of Atlantic City, who was assigned on December 11, 1946 to represent the five accused, testified that Nutter told him that he had been retained by the parents of some of the boys through a well known Philadelphia attorney, who is now a judge there. No member of the family of either Goodlet or Shaw denied these assertions nor was the Philadelphia attorney called as a witness, although his name was furnished.

There can be no doubt that Nutter was an experienced and capable attorney in the area of criminal law. The judge, who later formally assigned him as counsel for the accused (under circumstances to be discussed hereafter) described him as "eminently qualified—one of the best." In making the appointment he had in mind that Nutter was a prominent attorney "with considerable experience in criminal law." Present counsel for plaintiffs stipulated that in Nutter's 50-odd years of practice he "devoted a vast proportion of his work to the trial of cases."

According to Prosecutor Scott and the Assistant Prosecutor David R. Brone, who was associated with him in handling the case, Nutter had several conferences with

them before the matter was submitted to the Grand Jury for indictment. He was chiefly concerned about the death penalty "from the first to the last." Obviously he accepted the fact of his clients' guilt of the murder. He constantly importuned Scott and Brone not to seek the extreme penalty; he wanted "to save these young boys." There was much agitation in the community about the series of offenses and the murder, as well as pressure to go to trial. Finally, after holding the "decision in abeyance for quite some days," Scott and Brone concluded that a protracted trial involving five defendants, "two of them * * * under eighteen," with its possibility of reversible error and years of litigation, should be avoided. "* * * We considered all that and measured it against the public's rights and the rights of the individual defendants and we thought finally for ourselves as Prosecutors it would be best served [sic] to endeavor to get a life sentence for each and all five defendants." The matter was discussed with the judge who signed the order relinquishing the Juvenile and Domestic Relations Court jurisdiction (and who ultimately sat on the case in Oyer and Terminer) but no commitment was obtained from him. "He too was concerned with whether or not he should order a jury trial."

Ultimately after the indictments were returned and following further conferences with Nutter on all the charges, the State agreed to accept pleas of *non vult* to murder and of guilty to the robberies and the breaking and entering and larceny offense. The trial judge acquiesced in the result.

On December 10, 1946, all five accused appeared in court with Mr. Nutter for the purpose of pleading. Goodlet and Shaw testified in the present proceedings that the first time they saw Nutter was in the county jail on that morning where he told them *he had been appointed by the State to represent them.* And they said that after some very superficial discussion of the case for about 15 minutes they were taken to the court room to enter their *non vult* pleas. The sum of the discussion was alleged to be that Nutter was going to try to persuade the court to accept a *non vult*

plea "so that it would save our older partners from the chair." These representations were disbelieved by the court in the present matter and the record clearly supports him. The stenographic transcript of the proceeding on the day of plea shows that when the *non vult* pleas were entered by the accused, the court asked them if the effect and result of the plea had been explained to them. They answered in the affirmative and said they wished to enter such a plea. The appearance of Nutter for the defendants was noted stenographically at the beginning of the proceeding. After the pleas were accepted by the court, the Prosecutor requested that "some suggestion * * * be made on the record that they are represented by Mr. Nutter." Whereupon the court said:

> "Yes, enter the appearance of Mr. Nutter, and counsel will be appointed in addition to Mr. Nutter to collaborate with him, and he will also be appointed to represent all the defendants, *although he does represent them now*, but additional counsel will be appointed and he will be appointed by the Court to represent these people in the matter of sentence." (Emphasis added)

Thereafter, but on the same day, the court signed an order designating Nutter as their attorney. It is dated December 10 and undoubtedly was seized upon by plaintiffs as support for their statements that they never saw him until that day. The explanation for the order is simple and satisfactory. All five defendants were indigent, obviously unable to pay counsel and probably the parents had made no arrangements for fees. Under the statute then in force counsel appointed by the court to defend indigents charged with homicide could be allowed a fee payable by the county. *R. S.* 2:190–3. Therefore, although Nutter already represented the defendants, the Assistant Prosecutor agreed to ask the court to appoint him so that he would receive compensation for his work. The problem was explained to the court who consented to the arrangement.

McAllister was appointed as additional counsel for all five defendants on December 11, 1946. He too had long experience in the criminal law. He was admitted to prac-

tice in 1924 and had previously been an Assistant Prosecutor from 1927 to 1932; acting Prosecutor for one year thereafter; then Assistant Prosecutor from 1940 until the end of the then Prosecutor's term in 1945. Since then he has been in general practice.

Following his appointment, he went to see the Prosecutor and conducted his own investigation of the murder. He had a number of conferences with all five accused at the county jail. They frankly and freely told him they were all involved in the holdup where the killing occurred. Three of them said they had nothing to do with the actual killing; Goodlet and Shaw admitted firing one shot each at the victim. They told him also that they had signed confessions. He explained that on the facts all five could "very well" be convicted of first degree murder which would result in a mandatory death sentence, unless the jury recommended life imprisonment. He advised them that he could, if they wished, make an application to the court to retract their pleas of *non vult*. They declined. On two other occasions he made the same suggestion to them, the last time being on the day of sentence—December 19, 1946. Their decision to allow the pleas to stand, which they arrived at by discussion among themselves, was repeated to him. Mr. Nutter attended two of these conferences. He did most of the talking about the pleas to be entered in the robbery cases.

On December 19 all defendants and their counsel, Nutter and McAllister, appeared in the Court of Oyer and Terminer, for sentence on the murder indictment and for pleas and sentence on the other charges. The murder case was on the calendar of the judge who had accepted the *non vult* plea. The other indictments were on the list of the second County Judge. The lesser charges were taken up first, pleas of guilty were entered, and the sentences already enumerated were imposed.

The stenographic transcript of the sentence proceeding shows that when the first robbery indictment was read, two of the defendants pleaded not guilty; Shaw and one Smith pleaded guilty; Goodlet said: "I plead guilty to only one;

I plead guilty to this one." But as the other charges were successively read, both Goodlet and Shaw entered guilty pleas without comment, although one of their confederates pleaded not guilty to all of them. It is noted also that before the sentences were imposed, Mr. McAllister said:

"The only remarks I have to make concerning these indictments are that they were committed by these defendants, as they have pled, and I ask your Honor to bear in mind that these defendants are about to be sentenced on the charge of murder to which they have pled non vult."

Immediately thereafter the defendants were taken before the other judge who ordered life imprisonment on the murder charge. As part of the present claim of inadequacy of representation, Goodlet and Shaw criticize Messrs. Nutter and McAllister for recommending to the court that a life sentence would be just. Present counsel point out that under a *non vult* plea the court in his discretion could have imposed a second degree murder sentence which carries a maximum of 30 years in prison. *R. S.* 2:138–3 (now *N. J. S.* 2A:113–3). And they argue that the interests of these young men suggested the making of a plea for a specified minimum and maximum sentence within the lesser offense category. The reason for seeking the life sentence is plain, however, and it indicates experience on the part of former counsel rather than lack of it. In 1946 an anomalous situation existed with regard to parole. The then pertinent statute provided that a prisoner sentenced to the State Prison for a minimum and maximum period would not become eligible for parole until he had served the minimum term. *R. S.* 30:4–106.1. Thus in 1946 a 25–30 year sentence for second degree murder would not reach parole eligibility for 25 years (less whatever credits for work and good behavior were then allowed). Strangely enough, at that time a life term was preferable because parole eligibility came sooner. See *In re N. J. Court of Pardons*, 97 *N. J. Eq.* 555, 573, 574 (*Advisory Opinion of the Chancellor* 1925); *Worbetz v. Goodman*, 47 *N. J. Super.* 391, 407 (*App. Div.* 1957). The paradox no longer exists. *N. J. S. A.* 30:4–123.10, 11. So

if the trial judge had given a 25–30 year sentence for murder, as they might reasonably have thought he would, and directed it to run consecutive to the combined terms for the robbery and breaking and entering and larceny crimes (as the record shows he intended but inadvertently failed to do), and if the law had remained as it then was, the imprisonment would last much longer than if a consecutive life sentence had been imposed. The fortuitous circumstances which have benefited Goodlet and Shaw from a parole standpoint do not alter the fact that the course pursued by counsel with respect to sentence was actually in their interest.

On the totality of facts presented, we are satisfied that the fear of counsel as to a first degree murder conviction with a death sentence was a justified one and that their efforts to avoid the possibility represented a reasonable exercise of honest and informed judgment. But more important, we agree with the conclusion of the trial court on this writ that Goodlet and Shaw were represented by counsel prior to indictment and both before and after the *non vult* and guilty pleas and that they were fully aware of their guilt of the offenses charged and the consequences of their pleas. In reaching this result, we have given consideration, as did the trial court, to the testimony that Goodlet is "just a degree short of a great percentage of individuals who are dull normal in intelligence." The record is not at all persuasive that he suffered from lack of understanding of the jeopardy his criminal activity had created for him or that he was unaware of the significance of his pleas to the indictment, or that the pleas were not voluntarily and understandingly made.

All other grounds of attack on the sentences and the conduct of the hearing on this writ have been examined and found to be without merit. Accordingly the judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.